UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――
UNITED STATES OF AMERICA

                -v-

RICHARD SMITH,
                Defendant.
―――――――――――――――――――――――――――――

24-CR-688 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Defendant Richard Smith is charged in a three-count indictment alleging possession of firearms and ammunition after a felony conviction, 18 U.S.C. § 922(g); distribution of narcotics, 18 U.S.C. § 841; and firearms use, carrying, and possession, 18 U.S.C. § 924. (*See* ECF 19-4 ¶¶ 1-4.) Two firearms and detectable amounts of heroin and fentanyl were recovered in an August 1, 2024 search of 2764 Laconia Avenue in the Bronx, New York. (*See* ECF 19-7 ("Warrant") at 7-8.) Before the Court now is Smith's motion to suppress that evidence based on alleged violations of his Fourth Amendment rights. For the reasons that follow, the motion is denied.

**I.    Background**

      On August 1, 2024, Defendant's ex-girlfriend reported to New York City Police Department ("NYPD") officers that she and Defendant had been involved in a physical altercation and that Defendant had brandished a firearm. (*See* ECF 1 ("Compl.") ¶ 6(a); ECF No. 20 ("Mem.") at 3.) Defendant's ex-girlfriend also informed the officers that Defendant was living at his mother's house at 2764 Laconia Avenue, Bronx, New York. (Compl. ¶ 6(b); Mem. at 5.) Looking for Smith, NYPD officers arrived at 2764 Laconia that evening at approximately 9:30 p.m. and knocked on the front door, which was answered by Defendant's mother ("Ms. Smith"). (*Id.* ¶ 6(b); Mem. at 3, 5.) The officers asked Ms. Smith and her other son, Jojo, to step

outside, and shortly thereafter, obtained consent to search the premises for Defendant. (Mem. at 6-8; ECF No. 21 ("Opp.") at 4.) After determining that Defendant was not present, the officers requested that Ms. Smith call Defendant so that they could ask him to return to 2764 Laconia, which she did. (Mem. at 8; Opp. at 5.) When he arrived, he was arrested and led away. (Mem. at 10; Opp. at 5.) After Defendant departed, Sergeant John Migliaccio spoke with Ms. Smith and requested her consent to conduct a second search, this time of only Defendant's bedroom. (Mem. at 10; Opp. at 6.) Ms. Smith again consented. (Mem. at 10; Opp. at 6-7.) In Defendant's room, the officers recovered ammunition, suspected narcotics, and two locked safes. (Mem. at 11; Opp. at 7.) The next day, Officer Ralphy Reyes applied for a warrant to search the safes, received the warrant, and recovered Defendant's social security card, New York State identification card, ammunition, narcotics, and two firearms. (Mem. at 12; Opp. at 9.)

On May 9, 2025, Defendant filed a motion to suppress the evidence recovered from 2764 Laconia (ECF No. 18), along with a declaration (ECF No. 19) and memorandum of law (Mem.). The Government opposed the motion on May 30, 2025 (Opp.), and Defendant replied on June 13, 2025 (ECF No. 26 ("Reply")). The Court heard oral argument on the motion on June 23, 2025.

## II.     Legal Standard

### A.     Voluntary Consent

It is "well established that while a warrantless search of a home is generally unreasonable and therefore violates the Fourth Amendment, which proscribes unreasonable searches, an individual may consent to a search, thereby rendering it reasonable." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (quotation marks omitted). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412

U.S. 218, 227 (1973); *see also Birchfield v. North Dakota*, 579 U.S. 438, 478 (2016) (same). "The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004).

Although no individual factor is dispositive in determining consent, relevant considerations include "age, education, intelligence, length of detention, use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights," along with "whether guns were drawn or the consenting individual was frisked," and "whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent to the search." *United States v. Puglisi*, 790 F.2d 240, 243-44 (2d Cir. 1986). "[T]he fact that a defendant is in custody does not alone vitiate his consent to a search." *Id.* at 243. However, "[w]hen consent to search is preceded by an unlawful government seizure, the evidence obtained from the search must ordinarily be suppressed unless the Government shows both that the consent was voluntary *and* that the taint of the initial seizure has been dissipated." *United States v. Murphy*, 703 F.3d 182, 190 (2d Cir. 2012) (cleaned up); *see also United States v. Snype*, 441 F.3d 119, 133 (2d Cir. 2006) (same).

"[A] third party has authority to consent to a search of a home when that person (1) has access to the area searched and (2) has either (a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to the area." *Moore v. Andreno*, 505 F.3d 203, 208-09 (2d Cir. 2007); *see also United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992). Common authority is not "implied from the mere property interest a third party has in the property," but "rests rather on mutual use of the property by persons generally having joint access or control for most purposes . . . ." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974); *see also United States v. Gilmore*, 498 F. Supp. 3d 585, 589 (S.D.N.Y. 2020) ("[I]f a

third party has access to the area searched and permission to gain access to the area, that person would have authority to consent to the search.").

Separately, "a police officer's objectively reasonable belief that he has obtained consent, even if in fact he has not, renders a search constitutional." *Moore*, 505 F.3d at 209; *see also Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). In other words, "even if a third party lacks actual authority to consent to a search of a particular area, he still may have apparent authority to consent to the search." *Moore*, 505 F.3d at 209. However, the "apparent authority rule applies only to mistakes of fact and not mistakes of law." *Id.* (cleaned up); *see also United States v. Elliott*, 50 F.3d 180, 186 (2d Cir. 1995).

### B. Accuracy of a Warrant

Generally, there is "a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). "To overcome that presumption, a defendant must 'make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Lauria*, 70 F.4th 106, 124 (2d Cir. 2023) (quoting *Franks*, 438 U.S. at 155-56) (brackets omitted). "Thus, a defendant seeking 'to suppress evidence obtained pursuant to an affidavit containing erroneous information' must satisfy both a state of mind requirement and a materiality requirement by showing that '(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding.'" *Id.* at 125 (brackets omitted) (quoting *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000)).

4

"The materiality requirement is often considered first," and requires asking whether, after removing the alleged misstatements, "the affidavit, so corrected, establishes probable cause." *Id.* "If it does, the misstatements were immaterial, and suppression is unnecessary. If it does not, the misstatements were material, and the court must proceed to consider the affiant's state of mind in making the statement." *Id.* As to the affiant's state of mind, "[a] misrepresentation or omission is intentional when 'the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth.'" *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (quoting *Canfield,* 212 F.3d at 717-18). "Because states of mind must be proved circumstantially, a factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (quotations marks omitted).

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171. This threshold requirement "reflects the Supreme Court's concern that permitting a hearing that impugns the veracity of statements included in a search warrant affidavit without a 'sensible threshold showing' could lead to a 'new large-scale commitment of judicial resources' and the 'misuse of veracity hearings for purposes of discovery or obstruction.'" *United States v. Sandalo*, 70 F.4th 77, 85 (2d Cir. 2023) (cleaned up) (quoting *Franks*, 438 U.S. at 170). Accordingly, "courts have construed the burden imposed by the 'substantial preliminary showing' standard as a heavy one." *Id.* at 86.

### III. Discussion

#### A. Voluntariness

Ms. Smith's consent to search her home was voluntary and untainted by the circumstances of her interactions with the NYPD officers. Considering the totality of the

circumstances, Ms. Smith remained free to refuse the officers' entreaties at any time, and faced no threats, duress, or coercion. To the contrary, the officers' BWC footage reveals that they acted with reasonable care after receiving a complaint in which Defendant was accused of threatening another individual with a firearm;[1] that they asked for Ms. Smith's consent in clear, unambiguous language; and that Ms. Smith was alert and aware of her actions.

In the footage, Officer Tawee Theanthong tells Ms. Smith, prior to any search, that "we just want to make sure [Defendant] is not in there" and asks her "do you mind if we take a look, just to make sure for safety." (ECF No. 19-6, USAO_DM_0000044 ("Theanthong BWC") at 2:30-2:35.) Looking at Theanthong, Ms. Smith shrugs and replies "sure." (*Id.* at 2:34-2:36.) Theanthong then announces to the other officers, in Ms. Smith's presence, "alright guys, we got consent to search." (*Id.* at 2:35-2:37 (cleaned up).) Ms. Smith does not object. Throughout the interaction, Ms. Smith appears calm and unbothered. She is not restrained and does not protest the officers' questions or actions.

After Defendant arrives at the scene and is arrested, Sergeant Migliaccio speaks again with Ms. Smith and this time obtains her specific consent to search Defendant's bedroom. Standing on the other side of a wire fence, several feet away from Ms. Smith, Migliaccio first reassures Ms. Smith that his "camera is on," then requests permission to "take a look in just the area he stays in, in your house, to see if he has a gun there." (ECF No. 19-6,

---

[1] The officers may not have needed to secure Ms. Smith's consent for their initial search, as they generally may conduct a "quick and limited search of premises, incident to an arrest" when "conducted to protect the safety of police officers or others." *Maryland v. Buie,* 494 U.S. 325, 327 (1990). This kind of protective sweep must be "narrowly confined to a cursory visual inspection of those places in which a person may be hiding," and is justified only when a "reasonably prudent officer would be warranted in the belief, based on specific and articulable facts, and not on a mere inchoate and unparticularized suspicion or hunch, that he is dealing with an armed and dangerous individual." *Id.* at 327, 332 (quotation marks omitted). In any event, the officers here did secure Ms. Smith's consent before entering her home.

USAO_DM_0000058 ("Migliaccio BWC") at 7:25-7:36 (cleaned up).) Migliaccio clarifies that "like I said, you don't have to let us take a look in his area." (*Id.* at 7:55-7:57.) Ms. Smith protests that "you've been in my whole house," to which Migliaccio responds "we were just looking for him" and "we didn't start going through anything." (*Id.* at 7:58-8:05.) Migliaccio then reiterates that the officers "just want to go where he stays, that's it," and another officer chimes in to stress that the intended search is "not the whole house." (*Id.* at 8:05-8:08.) Ms. Smith agrees, saying "I can [inaudible] where he stays," to which Migliaccio responds "if you don't mind, it's like I said, you don't have to, we just want to make sure for safety." (*Id.* at 8:08-8:15 (cleaned up).) Ms. Smith then shows the officers to Defendant's bedroom, and they begin their search. (*Id.* at 8:15-9:00.) During the search, Ms. Smith looks on but does not protest or otherwise appear agitated. A few minutes into the search, Ms. Smith tells the officers that the room is messy because Defendant is "supposed to be taking the bigger room" next door. (*Id.* at 10:00-10:05.) Later, when Migliaccio points his flashlight at the room's closet and observes that Defendant "has a lot of stuff," Ms. Smith responds that "some of the stuff in there belongs to me." (*Id.* at 16:04-16:14.) Once the search is complete, Migliaccio presents Ms. Smith with a consent-to-search form. (*Id.* at 22:24-23:06.) Ms. Smith responds "I have to get my glasses" and leaves the room. (*Id.* at 22:07-22:08.) When she returns and begins reading the form, Migliaccio states that it is a "consent-to-search form" and says the police need it "cause we just asked earlier, on camera," and "on camera's not enough." (*Id.* at 24:23-24:47.) Ms. Smith appears to read the form before completing it with her information and signature. (*See id.* at 24:48-24:56, 25:57-26:36.) While she is completing the form, the officers leave her alone in her kitchen for brief periods of time. (*Id.*) At multiple points, Migliaccio states his belief that the house belongs to Ms. Smith. (*See, e.g.*, 13:47-13:52, 22:38-22:40.)

7

Viewed holistically, the footage reveals no deficiencies in the officers' conduct. The officers twice clearly and calmly asked Ms. Smith to provide verbal consent, which she did. They informed her multiple times that she had the right to withhold consent, which she declined to do, and then they confirmed her consent in writing while on the scene. They left her alone multiple times, and did not act in an imposing fashion when requesting her consent.

Defendant focuses on the fact that the officers initially grabbed Ms. Smith's wrist and led her out of her house. (Mem. at 6-7.) Although the "physical touching of the person by the officer" can be a factor suggesting that a seizure has occurred, *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990), "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain," *Torres v. Madrid*, 592 U.S. 306, 317 (2021). Here, the officers did hold Ms. Smith's wrist as they guided her away from her front door and down a small staircase, but the circumstances make clear that their physical contact was incidental and not intended to effect or communicate restraint. The officers immediately informed Ms. Smith that they were looking for her son, and that she was not accused of any wrongdoing. It is also apparent from the BWC footage that the officers did not touch Ms. Smith in order to detain her, but rather were merely attempting to guide her down her stairs and out of the officers' way in preparation for a search. Furthermore, even if the initial hand contact were ambiguous, the officers waited to request consent to search until Ms. Smith had fully descended her front stairs and was no longer being touched. Significant time—roughly an hour—also elapsed between when Ms. Smith provided her initial consent to search the house for Defendant and when she provided her more targeted consent for the officers to search Defendant's room. By that time, the crowd of officers had dissipated and Ms. Smith was alone in her fenced yard. Her consent

pertaining to Defendant's bedroom was therefore not tainted by her initial interactions with the officers, even assuming the initial interaction raised any concern over its voluntariness.

The cases on which Defendant relies are distinct. For example, Defendant invokes *United States v. Isiofia*, 370 F.3d at 232, in arguing that the officers unlawfully "demanded" Ms. Smith's consent to search (Mem. at 15). But in *Isiofia*, the defendant's consent "to the search of his apartment and car" was deemed involuntary "only after [he was] handcuffed to a table for over thirty minutes" and told "that if he did not provide his consent, he would be jailed and deported and would never see his family again." *Isiofia*, 370 F.3d, at 232-33 (brackets omitted). Nothing like that kind of direct coercion occurred here; rather, the officers acted in a calm, restrained manner, and did not threaten Ms. Smith in any way.

Defendant also cites *Philips v. County of Orange*, 894 F. Supp. 2d 345, 372 (S.D.N.Y. 2012). But there, the consenting parties were told by authorities that "they had no choice but to allow the home inspection," and that a "home visit was 'required' as part of the investigation." *Id*. at 371. Here, the officers at no point stated or implied that Ms. Smith was obligated to consent to a search; to the contrary, they informed her of her right to refuse. Ms. Smith also took the time to read and carefully consider a consent-to-search form before signing it.

In sum, the officers' interactions with Ms. Smith fell far short of constituting duress, coercion, or an unlawful seizure. Officers repeatedly asked Ms. Smith for permission to search, did not demand to enter her home, and reminded her multiple times of her right to refuse. Ms. Smith's consent was therefore voluntary and binding.

B. **Authority**

Ms. Smith had actual authority to consent to the search of Defendant's room because she had both access and common authority over the area. *See Moore*, 505 F.3d at 208-09. Several objective factors support this conclusion. The bedroom was in Ms. Smith's house; it was

apparently unlocked (ECF No. 19-6, USAO_DM_000048, at 4:48-4:51); Ms. Smith informed the officers that Defendant was in the process of switching rooms; and Ms. Smith stored some of her own belongings in the room.  The Second Circuit has been clear that even a lesser showing—that a co-tenant "had access and permission to enter, and could indeed enter at any time," *United States v. Lewis*, 386 F.3d 475, 481 (2d Cir. 2004)—is sufficient to establish actual authority.

Ms. Smith argues that Defendant "contributes to our household expenses by purchasing groceries, water, and other supplies," and "sometimes pays the cable bill as well."  (ECF No. 19-2 ¶ 6.)  But payment of incidental expenses does not prove that Defendant had private space within the home.  It is true that "[i]n rental property situations, a landlord does not have common authority over property rented [by] a tenant and thus may not give valid consent to search it." *United States v. Wilson*, 914 F. Supp. 2d 550, 559 (S.D.N.Y. 2012).  But common authority must ultimately be determined holistically, and the fact that one party is paying a portion of the other's expenses is not in itself sufficient to establish a landlord-tenant relationship.  Even where defendants are named on a lease or pay rent, such considerations are only among the many factors that influence whether a third party has common authority.  *See, e.g.*, *Moore*, 505 F.3d 209 n.6 (citing *United States v. Groves*, 470 F.3d 311, 319 (7th Cir.2006)); *United States v. Whyte*, 19-CR-64-1, 2020 WL 1862085, at *3 (D. Conn. Apr. 14, 2020) (holding that there was common authority where the defendant had paid some but "no more than half a month's rent"); *Wilson*, 914 F. Supp. 2d at 559 (holding that there was no common authority where the defendant paid rent for his room and also "always lock[ed] the door to prevent anyone from entering without his permission" (cleaned up)); *see also United States v. Perez*, 948 F. Supp. 1191, 1195, 1200-01 (S.D.N.Y. 1996) (holding that a father had authority to consent to a search

of his adult son's unlocked bedroom notwithstanding that the son "did contribute to the household expenses whenever he could").

Additionally, even if Ms. Smith lacked actual authority, the search was valid based on her apparent authority. From Ms. Smith's representations and their observations, the officers could have reasonably believed that: (1) Ms. Smith owned the house; (2) Defendant's room was unlocked and Ms. Smith had access to it; (3) Defendant was only temporarily staying in his current room; (4) Ms. Smith stored her own belongings in his room; and (5) Defendant did not pay rent and was not on the lease. Together, these circumstances sufficed to establish Ms. Smith's authority, and the officers were entitled to rely on them. As the Supreme Court has explained, "[t]he assumption tenants usually make about their common authority when they share quarters . . . [is] that any one of them may admit visitors, with the consequence that a guest obnoxious to one may be admitted in his absence." *Georgia v. Randolph*, 547 U.S. 103, 111 (2006). There is "no burden on the police to eliminate the possibility of atypical arrangements, in the absence of reason to doubt that the regular scheme was in place." *Id.* at 112.

Defendant also argues that even if the officers had authority to search his bedroom, they lacked authority to search under the bed, where they found the safes containing Defendant's firearms. (*See* Mem. at 18-19.) Defendant is correct that "not all the areas . . . in a room are equally private. As an illustration, a person has a greater expectation of privacy related to items hidden in his wall safe than in those scattered over his kitchen table." *United States v. Buettner-Janusch*, 646 F.2d 759, 766 (2d Cir. 1981). Here, however, the body camera footage shows no clear divide between the bed and the rest of the room, nor any discernible organization scheme from which the officers could have inferred that the bed area was differentially private. The room was small and messy and had no physical separation between the various areas searched by

11

the officers. While "[t]he consent of the host should ordinarily be insufficient to justify a warrantless search when it is obvious that the searched item is the exclusive property of the guest," this is not such a case. *Cf. United States v. Abdullah*, No. 12-CR-174, 2015 WL 790880, at *3 (W.D.N.Y. Feb. 25, 2015).

At oral argument, defense counsel also suggested that Defendant's safes themselves were distinctly private, and that law enforcement therefore could not open them. While courts have sometimes agreed with the position that a general consent to search does not extend to the opening of locked safes or other containers, *see, e.g.*, *Abdullah*, 2015 WL 790880, at *3 (collecting cases and suppressing evidence recovered from a locked safe), that is not what happened here. The officers did not open Defendant's safes at the time of the search, but rather confiscated them and only later searched them pursuant to a warrant. The Supreme Court "has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible." *Segura v. United States*, 468 U.S. 796, 806 (1984).[2] Here, the officers had probable cause to seize the safes based on the credible tip that Defendant possessed firearms, along with the officers' recovery of ammunition and suspected narcotics elsewhere in his room. Then, once law enforcement obtained a valid search warrant, *see infra* Section III.C, Ms. Smith's consent was not necessary to justify opening the safes.

---

[2] *Segura v. United States* invokes a distinction between searches and seizures of closed containers that the Supreme Court later rejected. *See California v. Acevedo*, 500 U.S. 565, 575-76 (1991). But the Court did so by lessening Fourth Amendment protections for searches of such containers, not by increasing protections for mere seizures. The underlying principle articulated in *Segura*—that temporary seizures pending a warrant are valid—is thus still good law.

### C. Accuracy of Warrant

Even if Reyes intentionally or recklessly misrepresented that Defendant's ex-girlfriend told law enforcement that Defendant stored his guns in safes, such information was not "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. To the contrary, the "remaining portions of the affidavit would support probable cause to issue the warrant." *United States v. Trzaska*, 111 F.3d 1019, 1027-28 (2d Cir. 1997). The alleged lie therefore does not render the warrant deficient, or invalidate the search performed pursuant to it.

Assessing probable cause requires the Court "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). With the allegedly misleading information excluded, Reyes's affidavit included sufficient information to raise a "fair probability" that the safes contained firearms. Specifically, Defendant allegedly pulled a gun on his ex-girlfriend shortly before the safes were recovered (Warrant at 7, ¶ 1(a)); narcotics were recovered from Defendant's room; and Reyes observed "metal clinking and large thumping sounds from inside the safes" that were consistent with his "personal experience of owning a similar safe to store [his] firearm and having heard that same sound upon moving the safe" (*id.* at 7-8, ¶ 1(d)).[3] The warrant was therefore well supported even absent the *ex ante* knowledge that Defendant stored guns in safes.

Defendant has not adduced sufficient evidence to justify holding an evidentiary hearing. Defendant speculates that, because the Government has not produced video evidence of

---

[3] While the officers' BWC footage shows them recovering apparent ammunition from Defendant's room prior to the seizure of the safes (Migliaccio BWC at 10:40-11:00, 13:52-53), that fact is omitted from Reyes's affidavit (Warrant at 7, ¶ 1(b) (stating that Reyes "concluded the safes contained firearms *and ammunition*" (emphasis added)).

Defendant's ex-girlfriend offering information about the safes unprompted, the Government must have improperly planted that information with her after recovering the safes from Ms. Smith's home. (Reply at 15-16.) But, as explained above, the officers had probable cause to seize the safes during their search, based on the tip and their recovery of other contraband in Defendant's room. And the later-issued search warrant for the safes was supported by probable cause for the same reasons. Thus, even if a hearing resulted in a determination that Reyes lied or acted recklessly, the searches of the safes would still be lawful.

Moreover, the mere fact that the officers did not video-record Defendant's ex-girlfriend's very first mention of the safes is insufficient to establish that police planted that information with her, particularly under the elevated standard applicable to *Franks* hearings. Nor would it have been improper for the officers to tell the ex-girlfriend that safes were recovered from Defendant's home and then to ask her whether the safes were likely to contain guns. Either way, the information she provided would merely have gone into the overall mix of information supporting probable cause, of which there was enough to support the warrant issued here.

## IV. Conclusion

For the foregoing reasons, Defendant's motion to suppress is denied.

The Clerk of Court is directed to terminate the motion at Docket Number 18.

SO ORDERED.

Dated: July 25, 2025
New York, New York

_____
J. PAUL OETKEN
United States District Judge